[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceeding
On September 14, 1990, fifteen months after their commitment to the Department of Children and Youth Services (DCYS) as neglected children, Michael and Mamie M., aged three and two respectively, became subject of these petitions by which DCYS seeks to terminate the parental rights of Gwendolyn M. (Gwen), their mother and, lacking an acknowledged, adjudicated or legal father, their sole legal guardian in order to secure a permanent home for them in adoption. The petitions allege only nonconsensual grounds for seeking such relief as set forth in Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1990; now Sec.17a-112 Rev. 1991). CT Page 5042
At the initial hearing on 10/4/90, service was confirmed on Gwen who appeared with court-appointed counsel. The name of a putative father, which had been on the petition as originally filed, was deleted by the agreement of all parties in the absence of any acknowledgment or adjudication of his paternity. Visitation, which had been denied following Gwen's most recent incarceration in May of 1990, was ordered to be instituted monthly, pendente lite, unless counter-indicated by a psychological evaluation which was ordered at the same time. Trial was delayed for this evaluation to be completed because of the failure of several of the parties to appear for the first appointment, and the mother's refusal to cooperate fully in the second. The final appointment took place on 3/12/91 and trial, scheduled on 1/30/91, begun on 4/1/91, was completed on 4/29/91. The parties were given to 5/28/91 for the filing of trial memoranda, the date on which the period of reserved decision is deemed to have begun.
On the first trial date, counsel for Gwen requested a continuance since the third report of the psychologist had not been received in writing by the court until 3/28/91. This motion was denied in the absence of any statute or Practice Book Rule requiring that all court-ordered clinical evaluations shall first be submitted in writing, and the failure of the respondent mother to offer any reason why her defense was prejudiced by the delayed submission of the third report. Gwen also moved to strike two of the nonconsensual grounds pleaded:
 (1) acts of parental omission or commission which resulted in the denial of necessary care, guidance or control, on the ground that Gwen had no legal responsibility to provide such care following the commitment to DCYS on 6/15/89. Decision was reserved.
 (2) abandonment, on the ground that the appropriate block on the printed petition indicating "mother", had not been checked, as had the block indicating "father." This was denied on the ground that the facts pleaded ("Mother has had minimal contact with her child") was sufficient notice for her to prepare her defense on this ground.
After the petitioner rested on 4/29/91, the first motion was granted for failure of DCYS to make out a prima facie case that the children had been denied any necessary care, guidance or control by anyone in the 15 months preceding the filing of these petitions. CT Page 5043
Facts
Evidence offered in two days of trial, interpreted in the light of the prior record in this court concerning these children and their mother, supports the finding of the following facts.
Both children had been born out of wedlock to their mother by the time she was 19 years old. The named father of both children has never acknowledged paternity, been adjudicated to be their father, lived with or supported them, nor does his name appear on their birth certificates. Gwen informed the psychologist that both pregnancies had resulted from rape.
DCYS began receiving referrals in 1987 on Michael, born Christmas Day of 1986, but took no action even after referrals continued to be made after Mamie's birth on 5/30/88. In March of 1989, following confirmation of a number of referrals from a variety of sources over the preceding five months concerning the children's physical, emotional and medical neglect, DCYS filed neglect petitions. Service was confirmed on Gwen for the initial hearing on 4/27/89, and, after two continuances and the appointment by the court suo moto of counsel to represent her in a fruitless attempt to secure her presence, on 6/5/89 both children were found, by default, to have been medically and physically neglected, and were committed to DCYS for an initial period of 18 months pursuant to subsection (d) of Sec. 46b-129.
On the date of commitment, the court was unable to articulate expectations that would lead to reunification of the family in the absence of the mother. Similarly, after commitment, DCYS was unable to negotiate a service agreement with her to achieve this same end because she had become homeless. Since she rarely initiated contact with DCYS, the state social worker had no way to get in touch with her. (Status report to court from DCYS dated 12/15/89.) According to the history Gwen later gave the clinical evaluator, she did not stop using marijuana, cocaine and alcohol until the spring of 1990, about the time of her most recent incarceration. In the year following her children's commitment, she continued abusing drugs, failed to secure housing for herself, and visited only sporadically, Michael more than Mamie. In May of 1990, she quarreled with her lesbian lover, was convicted of assault and sentenced to Niantic for five years, suspended after three. (State's Exh. A-3, p. 5.) Despite her infrequent and sporadic visitation and her failure to secure housing or treatment of any kind for the problems that had culminated in her children's removal, the DCYS treatment plan of February, 1990, continued to be reunification with their mother by August of that year. By August, however, Gwendolyn having been sentenced to prison, the CT Page 5044 treatment plan was to secure permanent homes for these children through adoption.
According to Mamie's foster mother with whom Michael also I lived for the first three months of commitment, Gwen began to visit the children at the end of July of 1989. There were two or three visits in August of 1989. Michael was moved to another foster home in September, and Gwen did not visit Mamie again until Thanksgiving of 1989. She visited both children in January of 1990, but there was no further contact until she called to schedule a visit on Mamie's second birthday, 5/30/90. Mamie was all dressed up, ready and waiting on that day, but Gwen did not come, nor did she call to explain the reason. Three weeks later DCYS learned that she had been incarcerated.
The DCYS social worker testified that Gwen was provided with the addresses and telephone numbers of the children's foster homes and, prior to her recent incarceration, she had never been denied a requested visit. Gwen never offered transportation problems as a reason for her failure to see her children on a regular basis. Except for the aborted birthday visit with Mamie, no visit or request for a visit was received by DCYS or either foster parent from January to June of 1990 when Gwen called from Niantic, reported her incarceration, and requested a visit at the prison. DCYS denied that request because of the impending filing of the termination petitions and the mother's failure to see her children for the five months preceding the request from prison. Since the order of the court on 10/4/90, however, the children have had monthly visits with their mother in Niantic which have gone well.
The court-ordered clinical evaluation of Gwen found her to be irritable, angry, with a "substantial history of psychosocial adjustment problems, antisocial behavior and a difficult personal history." (State's Exh. A-2, p. 8.) Homosexual, with a "substantial history of substance abuse, violent behavior, and arrests" (Id.), the evaluator found "her behavior ultimately . . . . seen as self-defeating." (Id.). Although initially the evaluator regarded Gwen as Michael's psychological parent (State's Exh,. A-2, p. 8), following a subsequent session with all the parties and both foster mothers, he found that Michael's relationship with his foster mother was stronger than with Gwen, concluding that the child "appears to have multiple psychological parents". (State's Exh. A-3, p. 12.) This is in contrast with the evaluator's observation that Mamie's foster mother was clearly her psychological parent and that she had no on-going relationship with her mother. (Id., p. 11.) The difference is ascribable to a number of factors: Michael had lived with his mother for the first two and one-half years of his life; Mamie for only a year. Michael had had to change CT Page 5045 foster homes after the first three months of placement while Mamie had remained with the same foster mother with whom she had been placed at the age of one. Because the psychologist found that Mamie would suffer "serious psychologically traumatic injury" if she were to be separated from her foster mother, he recommended that both children be reunited in that home. (Id., p. 12.) He did not recommend continued visitation with Gwen unless there were "a clear cut plan to reunite the mother and the children along with a high level of probability that this can be accomplished within the reasonably near future." (Id.)
In his testimony on 4/1/91, the psychological examiner noted that neither child sought affection from their mother, neither responded to her overtures or appeared even to recognize her. At one point during the last evaluation Mamie was asked, when her mother had left the room, "Who was that?" and responded, "Some boy." When Michael was asked, he shrugged and said, "I don't know." (Id., p. 5.) The psychologist found that Gwen displayed a "distinct disinterest" in Mamie, either ignoring or overtly rejecting her. If this were to be a permanent characteristic of her daily life, she would come to doubt herself, feel disliked, unwanted, with an unhealthy attitude toward herself. (Testimony of 4/1/91.) Since Gwen denied that substance abuse was a problem connected with her losing custody of her children, the psychologist found that the prognosis for her habitation was "poor". (Id.) He was unable to make a clearer prediction of her capacity to rehabilitate because, during both scheduled interviews, she had been irritable, impatient, and oppositional to the point of walking out despite being aware that the evaluation had been ordered by the court in connection with a pending action to terminate her parental rights. These qualities were apparent during the giving of this testimony from Gwen's humming audibly throughout the interrogation of this as well as other witnesses. Asked about this behavior, the witness found it significant of Gwen's irritability, difficulty with self-control and low frustration tolerance — qualities important for parenting. Assuming all variables most favorable to Gwen, the psychologist recommended that she be required to demonstrate for a period of one year at minimum an ability to maintain work, a stable living arrangement, freedom from further criminal activity and drug abuse, consistent engagement in counselling and a regular pattern of visitation before reunification with the children should even be considered. He questioned whether even Michael, with clearer memory of his mother, could wait that long before beginning the path toward permanency, and the evaluator saw no indication that Gwen could sustain these rehabilitative activities for this period.
The only evidence offered by the mother was to question the CT Page 5046 DCYS social worker as to an injury to Mamie noted during the most recent prison visit in April of 1990.
Adjudication — on facts as of 9/14/90
Because no amendments were filed to the original pleadings, the determination as to whether grounds exist to terminate Gwen's parental rights must be made on the date the petitions were filed, more than six months before trial. At that time Gwen was incarcerated for assaulting her lesbian lover, with an estimated release date two years later. While she had requested prison visits three months earlier, she had not seen either child for the five months preceding her incarceration in May of 1990. At no time in the 12 months preceding the filing of these petitions had she had a home of her own, engaged in either personal or drug counselling, or visited either child regularly. Although she was given the addresses and telephone numbers of both foster homes, she rarely phoned during this period, nor did she recognize birthdays or Christmas with gifts or calls.
The respondent mother's motion to dismiss the ground alleged relating to the denial of care by acts of parental omission or commission was granted following completion of the state's case, for lack of any evidence that either child had, in fact, been denied any aspect of proper cafe in the 12 months preceding the filing of these petitions. The state has, however, provided clear and convincing proof of the other three nonconsensual grounds pleaded for terminating Gwen's parental rights:
(1) Abandonment: While during the three months preceding the filing of these petitions, prison visits had been denied by DCYS notwithstanding Gwen's request for them, the evaluator testified that the absence of connection between the children and their mother was not ascribable solely to this three month hiatus of contact. From the time of their commitment in June of 1989 to the time Gwen requested prison visits a year later, her contacts with both children had been irregular and sporadic. She had stopped seeing both children altogether in January of 1990, and for five months had made no effort to contact either child. Even before January of 1990, her conduct failed to evidence the "reasonable degree of interest, concern or responsibility" that would preclude the finding of abandonment under the statutory definition: The social worker at the time testified on 4/1/91 that Gwen had called in October of 1989 and arranged to visit with both children in the office on 11/3/89. She failed to appear, and DCYS had no way to contact her. She called next on 12/6/89, without explaining the reason for the failed visit the month before, only to ask for the children's addresses and telephone numbers that she lost. She was invited CT Page 5047 to make her own arrangements to visit directly with the foster mothers and did so the next month: She had a long day visit with Mamie on 1/7/90 and a week-end visit with Michael the following week-end. (Testimony of Doreen Jordan, 4/1/91.) She did not ask for further contact with either child until she was incarcerated nearly five months later. This record constitutes clear and convincing proof that she has abandoned both children within the statutory definition of that term.
(2) Failure to rehabilitate: On the adjudicatory date, Gwen's situation, vis-a-vis being able to care for these children, had deteriorated from the time of their commitment. While she claimed to have stopped abusing drugs, this did not take place until her latest incarceration. She had no home when she was incarcerated, a circumstances not existing, at the time these children were committed. Nothing in the evidence permits even an inference that upon her release she will be any more capable of caring adequately for either of these children than she had been either during the year preceding their commitment, or during the 15 months subsequent thereto. The ultimate criterion for this ground for termination of parental rights is whether the parent is more able to resume the responsibilities of parenting at the time of filing the termination petition than she was at the time of commitment. The proof in this record is overwhelmingly negative, and nothing in it suggests that this will change within a reasonable time considering the children's needs. In Re Rayna M., 13 Conn. App. 23 (1987).
(3) No on-going parent-child relationship: There is clearly no relationship whatever between Mamie, who last lived with her mother at the age of 13 months, and Gwen. Mamie refers to her as "some boy" and evidences an unequivocal psychological bonding with her foster mother of the preceding year. Michael has a clearer memory of his mother and a weaker bond with his present foster mother, but after the final evaluation, the clinical psychologist concluded:
 At the present time, each child appears to primarily regard his and her foster mother as their primary caretaking parent and as their primary psychological parent. Michael is able to say that he believes that he and his sister have different mothers.
(State's Exh. A-3, p. 12.) Even Michael, by the time of the completed evaluation, did not display any positive feelings for his mother, nor can a trier of fact speculate from his conduct that he has any present positive memories or emotional ties with her. Even if there had been a period of regular visitation, this fact alone does not necessarily compel the conclusion that there exists a "relationship that ordinarily develops as a CT Page 5048 result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child" between a particular parent a child. In Re Juvenile Appeal (Anon.), 181 Conn. 683, 640 (1980). Compare In Re Jessica M.,217 Conn. 459 (1991). Absence of such relationship alone, of course, does not constitute grounds to terminate a parent's rights. This record supports by equally clear and convincing proof the second "prong" of this ground: Based upon Gwen's personal, psychological and legal situation, it is clear that to allow still further time for her to re-establish a parent-child relationship would be detrimental to each child
Disposition — as of the final day of trial.
In the seven months between the filing of these petitions and the dispositional date, no change has occurred in the relative situations of either parent or children. Gwen remains incarcerated with an uncertain release date. No evidence was offered that would permit the inference that her situation, upon release, would be any more conducive to her resuming child care responsibilities than it was during the year before her incarceration. In fact, at the time, she was incarcerated in May of 1990, she had not seen either child for more than four months preceding. There have been regular monthly visits at the prison and the resumption of some telephone calls to the foster homes, but this has produced no closing of the professionally observed emotional gap between mother and children.
The foregoing record supports by clear and convincing proof that it is in the best interests of both children for their mother's parental rights to be terminated so that they may know, after two years as foster children, the security of a permanent nurturing home through adoption. In reaching this conclusion the following factors have been duly considered, as required by subsection (d) of Sec. 17-43a:
(1) No services can be offered to a parent to facilitate reunion with a child when that parent has no home, cannot be contacted by the agency, and visits the child only infrequently and irregularly. Gwen was given the addresses and telephone numbers of the foster homes and encouraged to make her own arrangements. Transportation for visits was not an apparent problem, and no visit with the mother, prior to her incarceration, was ever refused. DCYS provided requested assistance in securing housing, but was unable to work out a clear plan for reunification due to the mother's lack of participation in both court hearings and administrative conferences. (2) No court expectations were spelled out for Gwen at the CT Page 5049 time of the children's commitment because she failed to appear at any of the three scheduled court hearings. The obvious prerequisites for reunifying this family — securing housing, engaging in counselling concerning the problems that led to the children's commitment, refraining from substance abuse, regular visiting with the children, and avoiding of criminal activity — that would have constituted any list of court expectations or provisions in a service agreement, were wholly unfulfilled. (3) The children's feelings and emotional ties with respect to Gwen and their foster parents was exhaustingly explored by the court-appointed psychologist who concluded that their primary ties were with the foster parents and that their connection with their mother had no clearly positive aspect. (4) On the dispositional date, Michael, four and one-half and Mamie, not quite three, had been nearly two years in foster homes. Even if all variables could be interpreted most favorably to their mother — that she would be discharged from Niantic at once and engage consistently in the rehabilitative measures outlined in (2) above — it would be at least a year more before reunification efforts could commence. By that time, both children would have spent more than half their lives in foster care. In the psychologist's opinion, neither child could pay the emotional price of this further delay. In fact, however, nothing in the record permits the trier of fact to conclude that it is reasonably probable that all such variables could be interpreted favorably to the mother. She continues to deny that drug abuse was connected with her losing custody of the children, only stopping (by her own admission) at the time of her incarceration. Her pattern of homelessness, mobility, destructive lesbian relationships and erratic manifestations of interest for her children whose births were both the results of rape, existed for a year before her incarceration, and no evidence was offered that it would be substantially changed upon her release. Children need the stability of a permanent home before they leave the narrow world of the family for the wider world of public school. Both Michael and Mamie will soon be of kindergarten age; their insecurity of caretaker should not survive to that time. (5) Gwen has made no apparent effort to adjust her circumstances, conduct or conditions to make it in the best interest of either child to return to her home — if she were to have a home — in the foreseeable CT Page 5050 future. When not incarcerated, she did not maintain regular contact with her children as part of an effort to be reunited with them, nor has she maintained regular contact or communication with either the foster parents or their legal guardian, DCYS. (6) For a period of three months following her request for prison visits, contact between Gwen and her children was denied by DCYS. The psychologist did not find this three month period, in the total of twenty-two months that the children have been out of her care, to be determinative of their relationship. Even if it were, the suspension of such visitation cannot be deemed unreasonable in view of the psychologist's recommendation that visitation be discontinued ". . . unless there is a clear cut plan to reunite the mother and the children along with a high level of probability that this can be accomplished within the reasonably near future. . ." (State's Exh. A-3, p. 5.) Because there is a very low level of such probability, there can be no plan — clear cut or otherwise — to reunite Gwen with these children, and therefore the suspension of visitation was reasonable under the circumstances.
Having considered the foregoing and having found the implementation of a permanent plan for these children without further delay to be in their best interests, it is ORDERED that the parental rights of Gwendolyn M. in and to her children Michael M. and Mamie M. be, and hereby are terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the children forthwith in adoption, and, to secure this end, such Commissioner is ORDERED to submit to this court within 90 days of the date of this judgment a written report as to the progress toward such adoption. If adoption of either child is not finalized by 10/1/92, the said Commissioner is further ORDERED to submit a Motion for Review of Plan for Terminated Child, in order to comply with the federal requirement for a judicial review of any child in the guardianship of the state at least every eighteen months.
7. Appeal
Gwen has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by her trial counsel of the court's judgment and her right to take an appeal, she affirmatively manifests her desire to do so, if her trial counsel is willing to act in that capacity, the court will appoint him for this purpose. If the respondent manifests her CT Page 5051 desire to take an appeal and if her trial counsel declines to represent her because in his professional opinion it lacks merit, he is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be appointed for this purpose. If the second attorney determines that here is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent mother will be informed by the clerk forthwith that she has the balance of the extended time to appeal in which to secure her own counsel who, if qualified, may be appointed to represent her on the appeal. If she does not do right to pursue an appeal will be ended and the termination of her parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise him is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Hartford this 28th day of June. 1991.
BRENNEMAN, JUDGE